MICHAEL DOCKTERMAN (admitted *pro hac vice*)
HEATHER H. HARRISON (admitted *pro hac vice*)
EDWARDS WILDMAN PALMER LLP
225 West Wacker Drive, Suite 2800
Chicago, IL 60606
Telephone: (312) 201-2000
Facsimile: (312) 201-2155
Email: mdockterman@edwardswildman.com
Email: hharrison@edwardswildman.com

CLINTON J. McCORD (SBN 204749)
EDWARDS WILDMAN PALMER LLP
9665 Wilshire Boulevard, Suite 200
Beverly Hills, California 90212
Telephone: (310) 860-8700
Facsimile: (310) 860-3800
Email: cmccord@edwardswildman.com

Attorneys for Plaintiff
UTHE TECHNOLOGY CORPORATION

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UTHE TECHNOLOGY CORPORATION,<br><br>Plaintiff,<br><br>vs.<br><br>AETRIUM, INC., HARRY ALLEN, *et al.*,<br><br>Defendants. | CASE No. 3:95-cv-02377-WHA<br><br>**SECOND AMENDED COMPLAINT**<br><br>**(1) FRAUD BY OMISSION**<br>**(2) CONSPIRACY TO COMMIT FRAUD**<br>**(3) CONVERSION**<br>**(4) INTENTIONAL INTERFERENCE WITH CONTRACT**<br>**(5) INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS**<br>**(6) CIVIL RICO**<br>**(7) SECURITIES FRAUD**<br>**(8) UNFAIR COMPETITION**<br><br>[DEMAND FOR JURY TRIAL] |

Plaintiff UTHE TECHNOLOGY, INC. ("UTHE") for its Second Amended Complaint in this matter following the successful prosecution of its arbitration claims against former defendants Peter Kwan (Managing Director), Y. K. Chow (CFO), Francis Chua (V.P. of Sales) and Katherine Yip (V.P. of Sales Administration) in Singapore, for which this action was stayed, alleges as follows:

## JURISDICTION AND VENUE

1. This Court has jurisdiction over the subject matter of this action pursuant to 28 U.S.C. §§ 1331 and 1332. The action involves a federal question, and the parties are diverse and the amount in controversy exceeds $75,000, exclusive of interest and costs. Venue in this district is proper under 28 U.S.C. §§ 1391(b)(2) and 1441(a).

## PARTIES

2. Plaintiff, UTHE, is a corporation organized and existing under the laws of the State of New Jersey with its principal place of business in Milpitas, California. UTHE is a manufacturer and distributor of semiconductor equipment.

3. Defendant AETRIUM, INC. ("AETRIUM") is a corporation organized and existing under the laws of the State of Minnesota and doing business in San Jose, Santa Clara County, California. At all relevant times, AETRIUM was also a manufacturer of semiconductor equipment.

4. Defendant HARRY ALLEN ("ALLEN") is an individual and was, at all relevant times, a resident of Minnesota and an officer and/or director of AETRIUM and its officer in charge of Asian sales. At all relevant times, including all times alleged herein, ALLEN acted in his official capacity as an officer of AETRIUM and in the scope of his employment by AETRIUM, and was an authorized agent of AETRIUM. AETRIUM knowingly approved of every action taken by ALLEN alleged herein and is responsible for all actions taken by ALLEN.

## ALLEGATIONS SUPPORTING CLAIMS AGAINST AETRIUM AND ALLEN

### The Business Relationships of the Parties

5. In 1987, UTHE established UTHE TECHNOLOGY (SINGAPORE) PTE, Ltd. ("UTHE SINGAPORE"), as a wholly-owned subsidiary corporation, incorporated in Singapore and doing business in Asia. The shares of UTHE SINGAPORE are a "security" as defined under United States law.

6. UTHE SINGAPORE was established to be the Asian distributor of semiconductor equipment manufactured by UTHE as well as the equipment of other semiconductor manufacturers, including AETRIUM.

7. Beginning shortly after its creation, UTHE SINGAPORE, under contract with UTHE, was UTHE's exclusive distributor of semiconductor equipment in Asia. As a distributor, UTHE SINGAPORE also entered into written agreements with manufacturers of semiconductor equipment and, under those contracts, filled orders from Asian purchasers of the manufacturers' equipment. The equipment itself was manufactured, supplied and invoiced by the manufacturers in the United States, and the revenue therefrom was collected by banks in the United States. The ultimate purchasers of the semiconductor equipment were the customers of the manufacturers, which were serviced by the Singapore distributor, UTHE SINGAPORE.

8. In the Summer of 1988, UTHE SINGAPORE entered into a written agreement with AETRIUM to be AETRIUM's exclusive distributor of certain semiconductor equipment in Asia (hereafter, the "UTHE/AETRIUM agreement" or "UTHE/AETRIUM distribution agreement"). The UTHE/AETRIUM agreement had a term of twenty years, commencing in July 1988, with subsequent automatic one-year renewal periods. By its terms, the agreement could only be terminated upon a material breach by the non-terminating party.

9. The UTHE/AETRIUM agreement was one of UTHE SINGAPORE's largest distribution agreements, and the revenue from the agreement was vital to the continued profitable existence of UTHE SINGAPORE. UTHE, as the sole owner and shareholder of UTHE SINGAPORE, and under its contract with UTHE SINGAPORE, directly received revenue generated by UTHE SINGAPORE, including revenue generated by the exclusive UTHE/AETRIUM distribution agreement, and the revenue from the UTHE/AETRIUM distribution agreement was also vital to UTHE's continued profitable existence.

10. By fiscal year ending June 30, 1992, UTHE SINGAPORE accounted for over 90% of UTHE's gross revenue.

11. Through communications with UTHE and UTHE SINGAPORE personnel, AETRIUM and ALLEN knew that UTHE received and depended upon the revenue it (UTHE)

received from its Singapore subsidiary, including revenue under the UTHE/AETRIUM distribution agreement.

**The Efforts To Divert and Destroy UTHE's Asian Semiconductor Business**

12. Beginning in the Spring of 1992, AETRIUM and ALLEN, in conjunction with key officers and directors of UTHE SINGAPORE, specifically Peter Kwan (Managing Director), Y. K. Chow (CFO), Francis Chua (V.P. of Sales) and Katherine Yip (V.P. of Sales Administration) (collectively, the "UTHE SINGAPORE PRINCIPALS"), engaged in a secret joint effort to establish a new Singapore corporation, entirely separate from UTHE, which the UTHE SINGAPORE PRINCIPALS, AETRIUM and ALLEN intended to use to take over UTHE's lucrative semiconductor distribution business in Asia.

13. AETRIUM and ALLEN assisted the UTHE SINGAPORE PRINCIPALS in creating the secret corporation in a number of ways both large and small. To help get the physical business up and running, AETRIUM and ALLEN provided office equipment, personnel and capital. AETRIUM and ALLEN also helped the UTHE SINGAPORE PRINCIPALS conceal confidential documents and information taken from taken from the UTHE SINGAPORE offices, including confidential client information about UTHE's and UTHE SINGAPORE's Singapore operations, from UTHE. AETRUM and ALLEN also actively concealed from UTHE their efforts, and those of the UTHE SINGAPORE PRINCIPALS, to create the secret corporation.

14. In addition to helping with the day-to-day logistics of getting the secret corporation up and running, AETRIUM and ALLEN played a critical role in ensuring that the new entity would be viable and able to perform its intended function of diverting UTHE's Asian semiconductor distribution business and clients by luring them away from UTHE SINGAPORE and to the secret corporation. AETRIUM and ALLEN did this in part by conspiring with the UTHE SINGAPORE PRINCIPALS to divert key distribution contracts away from UTHE SINGAPORE to the secret corporation, beginning with the UTHE/AETRIUM agreement.

15. Specifically, in June and July 1992 (only four years into the 20+ year UTHE/AETRIUM distribution agreement), AETRIUM and the UTHE SINGAPORE PRINCIPALS conspired to destroy the UTHE/AETRIUM agreement and divert the income under it away from

4
SECOND AMENDED COMPLAINT
17026444v1

UTHE and to themselves. Because the UTHE/AETRIUM agreement had another 16 years left in its term and could only be terminated for cause in the event of a breach, AETRIUM/ALLEN and the UTHE SINGAPORE PRINCIPALS conspired to replace the agreement with an amended agreement, one which could be terminated for any reason upon 30 days' notice, all while hiding their plan from UTHE. The agreement was amended in secret, and the amendment was carefully hidden from UTHE, for the specific purpose of diverting income from UTHE. Almost as soon as the ink was dry on the new secret agreement, the UTHE/AETRIUM agreement was terminated (again without any notice to UTHE) and the distribution business was transferred to the secret corporation. To compound UTHE's distress at the loss of business, AETRIUM also withheld payments which were already due under the UTHE/AETRIUM agreement (revenue upon which UTHE depended) and directed the payments later for the direct benefit of the UTHE SINGAPORE PRINCIPALS, cutting UTHE out altogether.

16. AETRIUM and ALLEN concealed these actions from UTHE because they knew how critical UTHE's relationship with its Singapore subsidiary and the clients it serviced through the subsidiary were to UTHE's business. They knew that if UTHE were alerted to the fact that AETRIUM/ALLEN and the UTHE SINGAPORE PRINCIPALS were diverting UTHE SINGAPORE's business to themselves, UTHE would take immediate action to stop it.

17. In addition to diverting both payments and performance under UTHE's subsidiary's most lucrative distribution agreement (the UTHE/AETRIUM agreement), AETRIUM and ALLEN worked to destroy UTHE's Singapore business in other ways. Prior to the conspiracy, UTHE had solid, long-standing relationships with its Asian customers. After AETRIUM and ALLEN formed the scheme and conspired with the UTHE SINGAPORE PRINCIPALS to create the secret corporation and divert AETRIUM business to it, the UTHE SINGAPORE PRINCIPALS also worked to convince UTHE's clients to cancel their orders with UTHE and place them with the secret corporation. Some of UTHE's clients balked at the unusual request. AETRIUM and ALLEN then stepped in and worked directly with the UTHE SINGAPORE PRINCIPALS to divert orders from UTHE SINGAPORE and to withhold commissions from UTHE SINGAPORE. Specifically, AETRIUM and ALLEN contacted UTHE SINGAPORE customers—some of whom were

SECOND AMENDED COMPLAINT
17026444v1

AETRIUM competitors—directly and convinced them to terminate their orders with UTHE SINGAPORE and enter into new arrangements, some of which were made with the secret corporation and some of which AETRIUM assumed directly, cutting out a distributor altogether. AETRIUM's and ALLEN's efforts were crucial to the viability of the secret corporation and the diversion of UTHE's Asian clients, contracts and orders.

18. Because it would leave an obvious trail leading back to it, AETRIUM did not take a direct ownership stake in the secret corporation, so it worked closely, and secretly, with the UTHE SINGAPORE PRINCIPALS (who became the stockholders of the secret corporation) in the conspiracy to carve up UTHE's Asian semiconductor business.

19. AETRIUM, ALLEN and the UTHE SINGAPORE PRINCIPALS profited immediately from this scheme because it cut UTHE out altogether and have profited further over time by allowing them to dominate distribution of the semiconductor equipment in Asia. As of June 14, 2012, the first page of AETRIUM's website proclaims AETRIUM the "world leader in the global semiconductor industry." AETRIUM was not the "world leader" prior to destroying UTHE's Asian subsidiary and business. The resultant damage to UTHE's Asian business over the intervening years runs well into the tens of millions of dollars.

20. Throughout their efforts to destroy UTHE's Asian subsidiary and business, AETRIUM, ALLEN and the UTHE SINGAPORE PRINCIPALS actively concealed everything from UTHE. They began their efforts to create the secret Singapore corporation in about May 1992. They worked throughout the Summer of 1992 in secret. However, in August 1992, UTHE's CEO received an anonymous letter relating that two of the UTHE SINGAPORE PRINCIPALS had incorporated a new entity. UTHE's CEO immediately sent the company's auditors to collect the company's Singapore documents for inspection. When the auditors arrived at the Singapore offices, UTHE SINGAPORE's documents had already been removed and concealed by the UTHE SINGAPORE PRINCIPALS with the help of AETRIUM and ALLEN. Informed that the documents were missing, UTHE's CEO himself flew to the Singapore offices only to discover that, in addition to having lost its critical business documents, UTHE SINGAPORE did not have a single employee.

AETRIUM, ALLEN and the UTHE SINGAPORE PRINCIPALS had persuaded all of UTHE's Singapore employees to leave *en masse* to the new corporation.

21. In the same timeframe, some of UTHE's important Asian customers (who upon information and belief had already been contacted by AETRIUM and ALLEN as well as the UTHE SINGAPORE PRINCIPALS) told UTHE's CEO that they were leaving UTHE. AETRIUM and the UTHE SINGAPORE PRINCIPALS had succeeded in gutting UTHE's Singapore business and destroying UTHE's Asian subsidiary, destroying UTHE's investment and cutting off its stream of revenue.

## **PROCEDURAL HISTORY OF THE LITIGATION**

22. UTHE originally filed this action on July 21, 1993, in Santa Clara County Superior Court against AETRIUM, ALLEN and the UTHE SINGAPORE PRINCIPALS who were primarily responsible for conspiring with AETRIUM and ALLEN to destroy UTHE's Singapore business. On August 20, 1993, two of the Defendants removed the action to this Court on the grounds of both diversity and federal question jurisdiction.

23. On December 8, 1993, before any of the Defendants filed an Answer, the Court issued an Order staying this action pending the outcome of an arbitration in Singapore between UTHE and the UTHE SINGAPORE PRINCIPALS, and dismissing the UTHE SINGAPORE PRINCIPALS on the grounds of *forum non conveniens*.

24. The arbitration and related court proceedings between UTHE and the UTHE SINGAPORE PRINCIPALS in Singapore were lengthy. On June 30, 2005, the arbitrator issued a confidential finding of liability in favor of UTHE but, under applicable rules, UTHE was not permitted to disclose the ruling or to take action upon it in this Court. After additional lengthy proceedings, on March 23, 2012, the arbitrator issued an award of damages in favor of UTHE. Subsequent proceedings in Singapore are ongoing, but UTHE has moved expeditiously to revive this action and move forward in this Court. A copy of the decisions in the arbitration are attached hereto and incorporated herein by reference as Exhibits 1 and 2, respectively. Those decisions establish beyond question the unlawful conspiracy in which AETRIUM and ALLEN engaged with the UTHE SINGAPORE PRINCIPALS. UTHE was not made whole by the arbitration, however, and proceeds

7
SECOND AMENDED COMPLAINT
17026444v1

on its claims in the Court to recover the balance of its damages by reason of these defendants' unlawful conduct.

25. Neither AETRIUM nor ALLEN were parties to the Singapore arbitration nor any related court proceedings in Singapore. None of the Singapore proceedings addressed any of UTHE's claims against AETRIUM or ALLEN, which form the basis of this action.

26. After the Court stayed this action in 1993, the parties filed periodic status updates until the case was closed, administratively, on October 27, 1997.

27. UTHE now seeks to have its claims against AETRIUM and ALLEN addressed in this action, as stated below.

## COUNT I

### (Against AETRIUM and ALLEN)

### FRAUD BY OMISSION

28. UTHE restates and incorporates herein the allegations in paragraphs 1 through 21.

29. Beginning in May 1992 and continuing until October 1992, ALLEN and AETRIUM, through its officers and directors, including ALLEN and then President and CEO Joseph Levesque, omitted and concealed from UTHE, including UTHE's President J. Michael Goodson, the fact that AETRIUM, ALLEN and the UTHE SINGAPORE PRINCIPALS were conspiring to destroy UTHE's Singapore subsidiary and business by creating a secret corporation and diverting UTHE's contracts, orders, customers and employees to the new competitor. For instance, in the summer of 1992, at the same time AETRIUM and ALLEN were working to divert business from UTHE's Singapore subsidary, ALLEN spoke to Mr. Goodson by telephone. ALLEN affirmatively stated to Mr. Goodson that he knew nothing about any efforts to divert business from UTHE's Singapore subsidiary. At the time he spoke to Mr. Goodson, ALLEN knew that his statement was false. He intentionally omitted and concealed any mention of the ongoing conspiracy to destroy UTHE's Asian semiconductor business. Mr. Goodson took ALLEN at his word and relied upon the misrepresentations, to UTHE's detriment.

30. The omitted fact (the existence of the ongoing conspiracy and efforts to destroy UTHE's Singapore business) was material. Had UTHE been made aware of the conspiracy in the

Spring or Summer of 1992, it could and would have acted immediately to prevent AETRIUM/ALLEN and the UTHE SINGAPORE PRINCIPALS from: (a) diverting UTHE's orders, contracts and clients being serviced by UTHE SINGAPORE to the secret corporation; (b) enticing UTHE SINGAPORE employees to desert the company; (c) removing and misappropriating confidential documents concerning UTHE's Singapore business, clients and business strategy (which belonged to UTHE and were kept at UTHE SINGAPORE's office).

31. AETRIUM and ALLEN had a duty to disclose their actions to UTHE because they had exclusive knowledge of those efforts and were aware that UTHE had no knowledge of what AETRIUM and ALLEN were doing. AETRIUM and ALLEN also had a duty to disclose their efforts because they, including through CEO Levesque, took active steps to conceal them from UTHE. Instead, AETRIUM and ALLEN conspired with the UTHE SINGAPORE PRINCIPALS to conceal their actions. For example, in conference calls occurring between AETRIUM (including CEO Levesque) and the UTHE SINGAPORE PRINCIPALS in the Summer of 1992, during which the conspirators discussed their plans to create the secret Singapore corporation and divert UTHE business to it, AETRIUM agreed to keep the conspirators' efforts concealed from UTHE, even though AETRIUM had direct contact with UTHE personnel during this period. AETRIUM and ALLEN also had a duty to disclose their efforts because in the Summer of 1992, ALLEN, on behalf of AETRIUM, made affirmative, and false, representations to UTHE CEO Michael Goodson that he knew nothing of the efforts to destroy UTHE's Asian semiconductor business, while at the same time concealing the details of those efforts from Mr. Goodson. ALLEN, on behalf of AETRIUM, also participated with UTHE SINGAPORE PRINCIPALS in the preparation of false reports to UTHE which misrepresented the amount of proceeds paid from AETRIUM to UTHE SINGAPORE in an affirmative effort to conceal the diversion of business away from UTHE and its subsidiary.

32. UTHE reasonably relied on the fact that all of the information it had received from ALLEN and the UTHE SINGAPORE PRINCIPALS in the Summer of 1992 gave the false impression that its Singapore business was doing fine in the Spring and Summer of 1992 while, in fact, it was being destroyed. Likewise, UTHE reasonably relied on the omitted fact of the destruction of its Asian subsidiary. Had AETRIUM and/or ALLEN revealed the truth to UTHE in

the Summer of 1992, UTHE would have acted immediately to stop the ongoing destruction of its business.

33. As a direct, proximate and foreseeable result of AETRIUM and ALLEN's fraudulent omission and concealment of their efforts to destroy UTHE's Singapore subsidiary and business, UTHE was damaged by the direct loss of a primary revenue stream and clients' business worth millions of dollars, as well as in the loss of confidential documents and information concerning its Singapore clients, operations and business strategy, which harmed its ability to do future business in Singapore.

## COUNT II

### (Against AETRIUM and ALLEN)

### CONSPIRACY TO COMMIT FRAUD

34. UTHE restates and incorporates herein the allegations in paragraphs 1 through 21 and 28 through 33.

35. As described above, AETRIUM and ALLEN worked with the UTHE SINGAPORE PRINCIPALS to create a secret Singapore corporation, destroy UTHE's Singapore subsidiary and divert UTHE's Singapore clients and revenue to the new corporation, and conceal everything from UTHE.

36. As part of their effort to destroy UTHE's Singapore business, AETRIUM and ALLEN engaged in a conspiracy to commit fraud. Specifically, in the Summer of 1992, ALLEN and AETRIUM, including through its President and CEO Joseph Levesque, participated in a number of conferences with the UTHE SINGAPORE PRINCIPALS, including Peter Kwan, Y. K. Chow and Katherine Yip, in which the conspirators discussed ways to conceal the gutting of UTHE SINGAPORE from UTHE, and affirmatively convince UTHE that nothing was wrong.

37. In August and September of 1992, one of the UTHE SINGAPORE PRINCIPALS Peter Kwan (the then Managing Director of UTHE SINGAPORE) affirmatively, and falsely, assured UTHE's President, J. Michael Goodson, that there was no new corporation being formed to compete with UTHE. AETRIUM and ALLEN knew of and assisted in Mr. Kwan's efforts to conceal the existence of the secret corporation and diversion of UTHE SINGAPORE's business from UTHE.

38. Throughout the Summer of 1992, by virtue of their knowledge and active participation in the conspiracy to destroy UTHE SINGAPORE and conceal the fact from UTHE, AETRIUM and ALLEN were always in a position to expose the conspiracy and counteract Mr. Kwan's fraudulent statements and omissions but chose not to do so.

39. In the Summer of 1992, in the middle of AETRIUM's and ALLEN's efforts to divert business from UTHE's Singapore subsidary, ALLEN spoke to Mr. Goodson by telephone. ALLEN affirmatively stated to Mr. Goodson that he knew nothing about Mr. Kwan's efforts to divert business from UTHE's Singapore subsidary. At the time he spoke to Mr. Goodson, ALLEN knew that his statement was false. He concealed what he knew about the efforts to create a secret corporation from Mr. Goodson for the purpose of effecting the agreement between AETRIUM, ALLEN and the UTHE SINGAPORE PRINCIPALS to secretly and fraudulently divert business away from UTHE's subsidiary to the secret corporation and AETRIUM directly.

40. As a direct and proximate result of AETRIUM and ALLEN's conspiracy to commit fraud, UTHE was damaged by the loss of a primary revenue stream and business worth millions of dollars, as well the loss of confidential documents and information concerning its Singapore clients, operations and business strategy, which harmed its ability to do future business in Singapore.

## COUNT III

### (Against AETRIUM and ALLEN)

### CONVERSION

41. UTHE restates and incorporates herein the allegations in paragraphs 1 through 21 and 28 through 40.

42. Under written agreements with UTHE SINGAPORE and its customers in Asia, UTHE had a contractual right to receive payments of amounts certain for the sale of its semiconductor products. UTHE also had a contractual right to receive payment of amounts certain from the distribution, by UTHE SINGAPORE, of AETRIUM's products in Asia.

43. As described above, AETRIUM and ALLEN actively participated in a conspiracy to create a secret corporation and divert revenue coming to UTHE through its Singapore subsidiary. As part of this conspiracy, AETRIUM and ALLEN contacted UTHE's customers directly and convinced

them to cancel orders and withhold and/or redirect payments for UTHE's products. AETRIUM also withheld its own payments which were due for the distribution of its products by UTHE SINGAPORE, part of which were contractually obligated to be transferred to UTHE.

44. As a result of UTHE's actions, money that was due to UTHE was diverted to and retained by AETRIUM and ALLEN and their co-conspirators. UTHE was thereby damaged in the amount of the revenue that was wrongfully taken and diverted from it, in the amount of millions of dollars.

## COUNT IV

### (Against AETRIUM and ALLEN)

### INTENTIONAL INTERFERENCE WITH CONTRACT

45. UTHE restates and incorporates herein the allegations in paragraphs 1 through 21 and 28 through 44.

46. Prior to engaging in a conspiracy to create a secret Singapore corporation and helping to divert contracts, order, customers, employees and revenue from UTHE SINGAPORE to the secret corporation, AETRIUM and ALLEN knew of the contract between UTHE and its wholly owned subsidiary UTHE SINGAPORE, under which UTHE SINGAPORE acted as the sole distributor for UTHE products in Asia and provided revenue to UTHE from such distribution. Indeed, AETRIUM had a similar contractual arrangement with UTHE SINGAPORE.

47. With knowledge of the contract between UTHE and UTHE SINGAPORE, AETRIUM and ALLEN intentionally engaged in acts designed to disrupt the contractual relationship. Specifically, AETRIUM and ALLEN participated in numerous conferences with the UTHE SINGAPORE PRINCIPALS to discuss methods for diverting UTHE's customers' orders being serviced through UTHE SINGAPORE to the secret corporation. By so doing, AETRIUM and ALLEN intended to make it impossible for UTHE SINGAPORE to continue to distribute UTHE's products to purchasers in Asia, so that they could divert the revenue from those customers to themselves.

48. As a direct, proximate and foreseeable result of the actions of AETRIUM and ALLEN, UTHE SINGAPORE was no longer able to fulfill its contractual duties to UTHE and the

contract between UTHE and UTHE SINGAPORE was disrupted. UTHE suffered millions of dollars of damages in the loss of a primary revenue stream and permanent harm to long-standing relationships with Asian customers.

49. AETRIUM and ALLEN's actions were intentional and independently wrongful in that they were committed with the intention of committing fraud and conversion, to wit, the theft of UTHE's contractual right to payment of revenue from its Singapore customers under its distribution agreement with UTHE SINGAPORE. For the same reasons the actions were committed with malice and oppression.

## COUNT V

### (Against AETRIUM and ALLEN)

### INTENTIONAL INTERFERENCE WITH ECONOMIC RELATIONS

50. UTHE restates and incorporates herein the allegations in paragraphs 1 thorugh 21 and 28 through 49.

51. Prior to engaging in a conspiracy to create a secret Singapore corporation and helping to divert contracts, order, customers, employees and revenue from UTHE SINGAPORE to the secret corporation, AETRIUM and ALLEN knew that UTHE had longstanding and lucrative relationships with its customers in Asia, which it serviced through its Singapore subsidiary.

52. With knowledge of those relationships, AETRIUM and ALLEN intentionally engaged in acts designed to disrupt them and divert revenue from them. Specifically, AETRIUM and ALLEN participated in numerous conferences and meetings with the UTHE SINGAPORE PRINCIPALS to discuss methods for diverting UTHE's customers' orders being serviced through UTHE SINGAPORE to the secret corporation. By so doing, AETRIUM and ALLEN intended to destroy UTHE's relationships with its customers and damage its reputation in Asia.

53. As a direct, proximate and foreseeable result of the actions of AETRIUM and ALLEN, UTHE's relationships with its customers were destroyed and its reputation was damaged.

54. AETRIUM and ALLEN's actions were intentional and independently wrongful in that they were committed with the intention of committing fraud and conversion, to wit, the theft of

UTHE's revenue from its Singapore customers under its distribution agreement with UTHE SINGAPORE. For the same reasons the actions were committed with malice and oppression.

## COUNT VI

### (Against AETRIUM and ALLEN)

### CIVIL RICO

55. UTHE restates and incorporates herein the allegations in paragraphs 1 through 21 and 28 through 54.

56. As described above, beginning in May 1992 and continuing until October 1992, AETRIUM and ALLEN engaged in a conspiracy with the UTHE SINGAPORE PRINCIPALS to create a secret Singapore corporation and divert orders and payments from UTHE customers being serviced by UTHE SINGAPORE, as well as remove and conceal UTHE's confidential documents and client information being kept in the offices of its Singapore subsidiary, all in an effort to carve up UTHE's Asian semiconductor business.

57. Beginning in May 1992 and continuing until October 1992, AETRIUM and ALLEN associated together with the UTHE SINGAPORE PRINCIPALS, specifically Peter Kwan, Y. K. Chow, Francis Chua and Katherine Yip, for the common purpose of destroying UTHE's Singapore business by creating a secret Singapore corporation to compete with UTHE and diverting UTHE's customers, contracts, orders and payments away from UTHE's Singapore subsidiary to the secret corporation or to AETRIUM directly. AETRIUM and ALLEN accomplished this purpose through a pattern of wire and mail fraud.

58. In the first week of July, 1992, AETRIUM, including through ALLEN and then President and CEO Joseph Levesque in Minnesota, engaged in an international telephone conference call with the UTHE SINGAPORE PRINCIPALS in which AETRIUM discussed and agreed to divert UTHE's distributorship business, including the UTHE/AETRIUM agreement, away from UTHE through fraudulent means. During the calls, AETRIUM agreed to amend the UTHE/AETRIUM agreement and conceal the amendment from UTHE. AETRIUM also agreed to withhold commissions that were already due under the UTHE/AETRIUM agreement so that they could be paid later for the direct benefit of the UTHE SINGAPORE PRINCIPALS and withheld from UTHE.

14
SECOND AMENDED COMPLAINT

17026444v1

On the calls, AETRIUM agreed to actively assist in the diversion of business from UTHE and to keep everything concealed from UTHE.

59. In early July 1992, after the conference call described in the preceding paragraph, AETRIUM, including through ALLEN and President/CEO Levesque in Minnesota, engaged in international telephone calls between the United States and Asia in which they and the UTHE SINGAPORE PRINCIPALS further discussed and agreed upon the method by which they would amend and terminate the UTHE/AETRIUM distribution agreement and divert business from UTHE to themselves. They also agreed to continue to conceal their efforts from UTHE.

60. In July, August and September 1992, AETRIUM and ALLEN engaged in international telephone conferences with the UTHE SINGAPORE PRINCIPALS in which they discussed and agreed upon ways to fraudulently convince UTHE customers in Asia to cancel contracts and orders with UTHE and divert them to the secret Singapore corporation or AETRIUM directly.

61. In the summer of 1992, ALLEN spoke by telephone to UTHE CEO Michael Goodson, who was located in Minnesota. ALLEN affirmatively stated to Mr. Goodson that he knew nothing about any efforts to divert business from UTHE SINGAPORE. At the time he spoke to Mr. Goodson, ALLEN knew that his statement was false. He intentionally and fraudulently omitted and concealed any mention of the active conspiracy to destroy UTHE's Asian semiconductor business in order to facilitate the ongoing diversion of orders and payments from UTHE customers being serviced by UTHE SINGAPORE.

62. In August and September 1992, AETRIUM and ALLEN contacted numerous UTHE customers in Asia directly through telephone calls and faxes, some of which originated in the United States. On information and belief, AETRIUM and ALLEN made representations to UTHE customers, which were false and which AETRIUM and ALLEN knew to be false at the time, that UTHE's Singapore subsidiary was unable and/or unwilling to continue to service their contracts and orders with UTHE and that the customers should place orders with the secret Singapore corporation or with AETRIUM directly. One such customer who AETRIUM (through ALLEN) contacted and directed such fraudulent representations, was National Semiconductor in Malaysia.

63. Throughout the Summer of 1992, the instructions to AETRIUM personnel in Asia, including to ALLEN, for formulating and executing the scheme of fraudulently diverting UTHE business to AETRIUM were carried out through mail and telephonic transmissions between the United States, Singapore and other parts of Asia, including, on information and belief, instructions from then CEO and President Levesque in Minnesota.

64. AETRIUM and ALLEN intended that UTHE's customers rely upon their fraudulent representations, and the customers did rely upon the representations in diverting their business away from UTHE for the benefit of AETRIUM and the UTHE SINGAPORE PRINCIPALS.

65. In September of 1992, one of the UTHE SINGAPORE PRINCIPALS Peter Kwan (the then Managing Director of UTHE SINGAPORE) affirmatively, and falsely, represented to UTHE's President, J. Michael Goodson, in a telephone conversation between the United States and Asia, that there was no corporation being formed to compete with UTHE. AETRIUM and ALLEN assisted in Mr. Kwan's efforts to conceal the existence of the secret corporation by omitting any mention of it in communications with UTHE in the Summer of 1992. Throughout the Summer of 1992, by virtue of their knowledge and active participation in the conspiracy to destroy UTHE's Singapore business and conceal the fact from UTHE, AETRIUM and ALLEN were in a position to expose the conspiracy and Mr. Kwan's fraudulent assurance to Mr. Goodson but chose not to do so.

66. As a direct, proximate and foreseeable result of the fraudulent communications described above, UTHE was damaged in the direct loss of its customers, contracts and orders for semiconductor business in Asia.

67. The activities of AETRIUM and ALLEN violated the Racketeer Influenced and Corrupt Organizations Act, specifically, 18 U.S.C. §§ 1962(c) and (d). As explained above, AETRIUM and ALLEN conducted an associated-in-fact enterprise as part of a group of persons (themselves and the UTHE SINGAPORE PRINCIPALS) associated together for the common purpose of engaging in a course of conduct designed to create a secret corporation—the principal enterprise by which the conspiracy was accomplished—to fraudulently divert UTHE's Asian business to it and themselves. As part of this enterprise and to accomplish its illegitimate purpose,

AETRIUM and ALLEN engaged in a pattern of racketeering activity, to wit, the numerous acts of mail and wire fraud described above.

68. The activities of AETRIUM and ALLEN entitle UTHE to redress under 18 U.S.C. § 1964(c).

## COUNT VII

### (Against AETRIUM and ALLEN)

### SECURITIES FRAUD

69. UTHE restates and incorporates herein the allegations in paragraphs 1 through 21 and 28 through 68.

70. As described above, beginning in May 1992 and continuing until October 1992, ALLEN and AETRIUM, through its officers and directors, including ALLEN and then President and CEO Joseph Levesque, omitted and concealed from UTHE, including UTHE's President J. Michael Goodson, the fact that AETRIUM, ALLEN and the UTHE SINGAPORE PRINCIPALS were conspiring to destroy UTHE's Singapore subsidiary and business by creating a secret corporation and diverting UTHE's contracts, orders, customers and employees to the new competitor.

71. For instance, in the summer of 1992, in the middle of AETRIUM's and ALLEN's efforts to divert business away from UTHE's Singapore subsidiary, ALLEN spoke to Mr. Goodson by telephone. ALLEN affirmatively stated to Mr. Goodson that he knew nothing about any efforts to divert business from UTHE SINGAPORE. At the time he spoke to Mr. Goodson, ALLEN knew that his statement was false. He intentionally omitted and concealed any mention of the ongoing conspiracy to destroy UTHE's Asian semiconductor business.

72. The material omission by AETRIUM and ALLEN of the fact that they were working in the Summer of 1992 to destroy UTHE's business was done with the specific intention of preventing UTHE from taking steps to stop the destruction of its business, so that AETRIUM and ALLEN could obtain the business for themselves, and also of depressing the value of UTHE SINGAPORE so that the UTHE SINGAPORE PRINCIPALS (and AETRIUM and ALLEN working through the UTHE SINGAPORE PRINCIPALS) could seize control of the company from UTHE. AETRIUM and ALLEN intended that their co-conspirators be able to purchase all of the stock of

UTHE SINGAPORE at a heavy discount, after which they could direct more revenue from UTHE's Asian business to AETRIUM and ALLEN.

73. As described above, including in paragraphs 56 through 66, AETRIUM and ALLEN used telephone communications and faxes, including numerous communications originating from the United States, to effect their fraud upon UTHE.

74. In October 1992, with UTHE's Singapore subsidiary losing UTHE's Asian contracts and clients and with AETRIUM's and ALLEN's participation in the scheme being concealed from UTHE, UTHE was fraudulently induced into selling all of its shares of UTHE SINGAPORE to the UTHE SINGAPORE PRINCIPALS for a fraction of what they would have been worth absent the fraud, including the fraudulent omissions and concealment of AETRIUM and ALLEN. Because of the fraudulent omissions and concealment of their efforts to divert UTHE's Asian business, UTHE was under the impression that UTHE SINGAPORE would soon have no clients and would be essentially without value.

75. The fraudulent omissions and concealment by AETRIUM and ALLEN from UTHE of their efforts to divert business from UTHE SINGAPORE was a direct and proximate cause of the economic loss suffered by UTHE in the depressed stock price. Had UTHE known the truth, including the fact that it could have convinced some customers to return by exposing the fraud of AETRIUM and ALLEN, it would not have sold the shares to the UTHE SINGAPORE PRINCIPALS at the depressed price.

76. Under Section 10(b) of the Securities Exchange Act of 1934, as amended, 15 U.S.C. § 78(j)(b), AETRIUM and ALLEN are accountable to UTHE for the difference between the artificially depressed stock price actually paid for the UTHE SINGAPORE shares and the true value absent the effects of the wrongful conduct of AETRIUM and ALLEN.

## COUNT VIII

### (Against AETRIUM and ALLEN)

### UNFAIR COMPETITION

77. UTHE restates and incorporates herein the allegations in paragraphs 1 through 21 and 28 through 76.

18
SECOND AMENDED COMPLAINT
17026444v1

78. California Business & Professions Code § 17200, *et seq*., prohibits any "unlawful, unfair or fraudulent business act or practice."

79. AETRIUM and ALLEN committed unlawful business practices through their actions in violation of 18 U.S.C. §§ 1962(c) and (d) (as described in paragraphs 55 through 68 above) and in violation of 15 U.S.C. § 78(j)(b) (as described in paragraphs 69 through 76 above).

80. AETRIUM and ALLEN committed fraudulent business practices through their actions as described in paragraphs 1 through 21 and 28 through 40 above.

81. As a result of AETRIUM's and ALLEN's violation of Business & Professions Code § 17200, *et seq*., UTHE has suffered an actual injury, including direct injury to its business operations in California, amounting to millions of dollars.

## **PRAYER FOR RELIEF**

WHEREFORE, UTHE respectfully requests that the Court enter judgment in its favor and against AETRIUM and ALLEN as follows:

### **Counts I , II, III, IV, V and VII**

1. For a full accounting;
2. For an award of actual damages according to proof at trial;
3. For punitive damages in an amount sufficient to punish and deter Defendants;
4. For costs and expenses incurred herein;
5. For interest at the maximum rate allowable by law;
6. For such other and further relief as the Court deems just and proper.

### **Count VI**

1. For an award of threefold of actual damages according to proof at trial;
2. For an award of costs of suit, including reasonable attorney's fees;
3. For interest at the maximum rate allowable by law;
4. For such other and further relief as the Court deems just and proper.

### **Count VIII**

1. For appropriate injunctive relief;
2. For restitution according to proof at trial;

3. For costs and expenses incurred herein;

4. For interest at the maximum rate allowable by law;

5. For such other and further relief as the Court deems just and proper.

## DEMAND FOR JURY TRIAL

UTHE hereby requests a trial by jury on all claims and issues so triable.

Dated: July 5, 2012

EDWARDS WILDMAN PALMER LLP

/s/ Clinton J. McCord             .
Michael Dockterman
Clinton J. McCord
Heather H. Harrison
EDWARDS WILDMAN PALMER LLP
9665 Wilshire Boulevard, Suite 200
Los Angeles, CA 90212
Telephone: (310) 860-8700
Facsimile: (310) 860-3800

Attorneys for Plaintiff UTHE TECHNOLOGY CORPORATION