MICHAEL DOCKTERMAN (admitted *pro hac vice*)
HEATHER H. HARRISON (admitted *pro hac vice*)
EDWARDS WILDMAN PALMER LLP
225 West Wacker Drive, Suite 3000
Chicago, IL 60606
Telephone: (312) 201-2000
Facsimile: (312) 201-2155
Email: mdockterman@edwardswildman.com
Email: hharrison@edwardswildman.com

CLINTON J. McCORD (SBN 204749)
EDWARDS WILDMAN PALMER LLP
1901 Avenue of the Stars, Suite 1700
Los Angeles, CA 90067
Telephone: (310) 860-8700
Facsimile: (310) 860-3800
Email: cmccord@edwardswildman.com

Attorneys for Plaintiff
UTHE TECHNOLOGY CORPORATION

# UNITED STATES DISTRICT COURT

# NORTHERN DISTRICT OF CALIFORNIA

| | |
|---|---|
| UTHE TECHNOLOGY CORPORATION, | CASE No. 3:95-cv-02377-WHA |
| Plaintiff, | **DECLARATION OF TAN LEE TIAN (KATHERINE YIP) IN SUPPORT OF PLAINTIFF'S OPPOSITION TO DEFENDANTS' MOTION FOR SUMMARY JUDGMENT** |
| vs. | |
| AETRIUM, INC., HARRY ALLEN, *et al.*, | |
| Defendants. | Date: September 5, 2013<br>Time: 8:00 a.m.<br>Dept.: Courtroom 8, 19th Floor<br>Judge: Hon. William H. Alsup |

# DECLARATION

I, Tan Lee Tian (also known as Katherine Yip), declare as follows:

1. I was an employee of Uthe Technology (Singapore) Pte. Ltd. ("Uthe Singapore") from about November 1976 to early 1997.

2. Prior to October 1992, Uthe Singapore was a subsidiary corporation of Plaintiff Uthe Technology Corporation ("Uthe USA"). Uthe Singapore was, and still is to my knowledge, in the business of marketing, distributing, producing and servicing equipment, tools and parts used in the semiconductor industry. While I worked at Uthe Singapore, we took orders from customers for the products of manufacturers (or "principals") and arranged for the delivery of the principals' products to the customers in exchange for commissions on the sales and discounts on products. Uthe USA was one such principal. Defendant Aetrium, Inc. ("Aetrium") was another. Until October 1992, Uthe Singapore serviced the customers of both principals.

3. In 1992 I was the Sales Administration Manager of Uthe Singapore. My duties were to manage the procurement of merchandise from Uthe Singapore's principals to be sold and delivered to customers. In that position I was the primary contact between Uthe Singapore and Defendants Aetrium and Harry Allen. I had frequent communications with them.

4. In 1992 I was personally involved in a conspiracy with Aetrium and Mr. Allen to divert business away from Uthe Singapore. The plan began in about April 1992, when myself and the other principals of Uthe Singapore, including Kwan Seik Cheong, Chow Yoke Keng and Chua Chow Tien (collectively, the "Uthe Singapore officers"), began discussing a plan to take over Uthe Singapore's business and cut out Uthe USA and its principal, Mr. Michael Goodson.

5. As part of this plan, in early July 1992, I participated in a phone call with the Uthe Singapore officers and Aetrium President Joseph Levesque, and other executives from Aetrium. The Uthe Singapore officers and I were in Singapore and the Aetrium executives were in the United States. During that call we discussed and agreed upon a plan to divert business and income away from Uthe Singapore. Specifically, the Aetrium persons on the call, including Mr. Levesque, specifically and verbally agreed: (1) that Aetrium would withhold commissions that were earned by and payable to Uthe Singapore on the sale of Aetrium products so that they would not show up on

Uthe Singapore's books; (2) to secretly alter the terms of Aetrium's distribution contract with Uthe Singapore so that it could be quickly terminated and switched over to a new shell company if necessary; (3) divert orders from customers away from Uthe Singapore; (4) conceal everything from Uthe USA and Mr. Goodson. The purpose of this conspiracy was to divert business away from Uthe Singapore, including the sale of Aetrium products under the altered distribution agreement. In addition, we hoped that by lowering the apparent value of Uthe Singapore (by keeping sales and commission off of its accounts), we might be able to convince Uthe USA and Mr. Goodson to sell the company cheaply, so that we would have complete control of the company and would be able to partner with Aetrium and focus on the distribution of Aetrium products at the expense of Uthe USA. The planned partnership with Aetrium, including the servicing of Uthe Singapore clients, was intended to continue indefinitely into the future.

6. In July 1992, with the knowledge, approval and assistance of Aetrium and Mr. Allen, I began the process of diverting business away from Uthe Singapore.

7. The diversion of orders from Uthe Singapore was carried out in the following manner: I and Kwan Seik Cheong contacted customers who had placed orders through Uthe Singapore and asked them to cancel the orders and reissue them with a competitor company that we had set up in secret. I was responsible for contacting customers for Aetrium products. Sometimes the customers were not comfortable cutting out Uthe Singapore. In those instances, I worked with Aetrium and Harry Allen to convince the customers to reissue the orders with Aetrium directly. Also, from the beginning of the conspiracy until after it was discovered by Mr. Goodson, I and others at Uthe Singapore had many phone calls and exchanged dozens and dozens of faxes with Aetrium and Mr. Allen in the United States as part of the scheme to divert customers and business away from Uthe Singapore and continue to service the clients that we had diverted orders from.

8. This plan to secretly divert customers away from Uthe Singapore, and profit from the ongoing service of those customers at the expense of Uthe USA, was intended to continue indefinitely into the future. The goal of the conspiracy between Uthe Singapore and Aetrium and Allen was not simply to buy Uthe Singapore. Taking over Uthe Singapore was one step in the overall plan for Aetrium and the employees and officers of Uthe Singapore to profit by cutting Uthe

USA out of the picture and preventing future payments to Uthe USA. In fact, we knew that it might not be possible to take over Uthe Singapore, if Uthe USA and Mr. Goodson could not be convinced to sell it. That is why we set up a secret shell corporation in 1992—to divert Uthe Singapore orders to and continue the business of distributing products to Uthe Singapore customers in the event that Uthe Singapore remained under the control of Uthe USA. Taking over Uthe Singapore was never the end goal of the conspiracy, it was simply a step in the plan to profit by keeping all of the business and profits from that company for ourselves.

9. After Uthe USA sold Uthe Singapore to the Uthe Singapore officers in October 1992, we continued to service customers, including Aetrium customers, and accept payments, part of which would have gone to Uthe USA if we had not been able to continue to keep our diversions hidden from Uthe USA and Mr. Goodson. The conspiracy, including the agreement between Uthe Singapore and Aetrium to keep everything that we had done hidden from Uthe USA and Mr. Goodson, was exposed sometime in the summer of 1993, when Aetrium, Mr. Allen, myself and the other Uthe Singapore officers were sued in the United States by Uthe USA. Mr. Goodson's discovery of the conspiracy and the lawsuit is what brought it to an end, even though payments that should have gone to Uthe USA were withheld even after the conspiracy was discovered. If Mr. Goodson had not discovered the conspiracy to divert orders and contracts away from Uthe Singapore, we would have kept it secret from him to this day and continued to service customers and withhold payments.

I declare under the penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed on this 14th day of August, 2013, at Singapore.

Tan Lee Tian (Katherine Yip)